William P. Keith – CA Bar No. 270587
wkeith@kleinandwilson.com
Manoah S. Marton – CA Bar No. 340887
mmarton@kleinandwilson.com
KLEIN & WILSON LLP
4770 Von Karman Avenue
Newport Beach, California 92660
(949) 631-3300; Facsimile (949) 631-3703

Attorneys for Defendant, Counterclaimant, and Third-Party Plaintiff
Q TRADE INTERNATIONAL CORP., a Texas corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LAMILL, INC., a California corporation,

Plaintiff,

v.

Q TRADE INTERNATIONAL CORP., a Texas corporation; Q TRADE INTERNATIONAL CORP., dba QTRADE TEAS & BOTANICALS and DOES 1 through 10, inclusive,

Defendants.

AND RELATED THIRD-PARTY ACTION.

**CASE NO. 2:26-cv-08026 MWC(BFMx)**

**DEFENDANT Q TRADE INTERNATIONAL CORP.'S ANSWER TO PLAINTIFF LAMILL, INC.'S SECOND AMENDED COMPLAINT; JURY DEMAND; COUNTERCLAIM**

Defendant Q Trade International Corp. ("Q Trade" or "Defendant") answers the unverified second amended complaint ("SAC") of plaintiff Lamill, Inc. ("Plaintiff") as follows:

Q Trade responds to the allegations of the SAC only on behalf of Q Trade International Corp. and not on behalf of any other person or entity. All allegations are denied unless specifically admitted, and any factual averment is admitted only as to the specific facts and not as to any conclusions, characterizations, implications, or speculations contained in the averment or in the SAC as a whole.

Q Trade also responds that the headings in the SAC do not constitute allegations of fact requiring a response. To the extent the headings may be construed as allegations of fact, Q Trade denies the allegations because they are too vague to be expressly admitted or denied, or because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

**JURISDICTION AND VENUE**

1. In answer to Paragraph 1 of the SAC, Q Trade admits it is subject to personal jurisdiction in the Central District of California. Except as to those allegations expressly admitted, Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations, and on that basis denies them.

2. In answer to Paragraph 2 of the SAC, Q Trade admits venue is proper in the Central District of California. Except as to those allegations expressly admitted, Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations, and on that basis denies them.

**GENERAL ALLEGATIONS**

3. In answer to Paragraph 3 of the SAC, Q Trade admits that at the time this action was filed, Lamill, Inc. was a California corporation. Except as to those allegations expressly admitted, Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations, and on that basis denies them.

4. In answer to Paragraph 4 of the SAC, Q Trade admits that Q Trade International Corp. is a Texas corporation, licensed to conduct business in the State of Texas, and with its principal place of business in Brookshire, Texas. Except as to those allegations expressly admitted, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

5. In answer to Paragraph 5 of the SAC, Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations, and on that basis denies them.

6. In answer to Paragraph 6 of the SAC, Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations, and on that basis denies them.

7. In answer to Paragraph 7 of the SAC, Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations, and on that basis denies them.

8. In answer to Paragraph 8 of the SAC, Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations, and on that basis denies them.

## FACTUAL ALLEGATIONS

### Business Relationship and Fraud Re Organic Certification

9. In answer to Paragraph 9 of the SAC, Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations, and on that basis denies them.

10. In answer to Paragraph 10 of the SAC, Q Trade admits that the quoted text accurately reflects part of a statement on Q Trade's LinkedIn profile. Except as to those allegations expressly admitted, Q Trade denies the allegations of this paragraph.

11. In answer to Paragraph 11 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because it does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

12. In answer to Paragraph 12 of the SAC, the allegations are non-factual, argument, or state a legal conclusion to which no response is required. To the extent the remaining allegations in this paragraph require a response, Q Trade denies the allegations because they are too vague to be expressly admitted or denied.

13. In answer to Paragraph 13 of the SAC, the allegations are non-factual, argument, or state a legal conclusion to which no response is required. To the extent the

/ / /

remaining allegations in this paragraph require a response, Q Trade denies the allegations because they are too vague to be expressly admitted or denied.

14. In answer to Paragraph 14 of the SAC, the allegations are non-factual, argument, or state a legal conclusion to which no response is required. To the extent the remaining allegations in this paragraph require a response, Q Trade denies the allegations because they are too vague to be expressly admitted or denied.

15. In answer to Paragraph 15 of the SAC, the allegations are non-factual, argument, or state a legal conclusion to which no response is required. To the extent the remaining allegations in this paragraph require a response, Q Trade denies the allegations because they are too vague to be expressly admitted or denied.

16. In answer to Paragraph 16 of the SAC, Q Trade denies the allegations.

17. In answer to Paragraph 17 of the SAC, Q Trade denies the allegations.

18. In answer to Paragraph 18 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

19. In answer to Paragraph 19 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

20. In answer to Paragraph 20 of the SAC, Q Trade denies the allegations.

21. In answer to Paragraph 21 of the SAC, Q Trade denies the allegations.

22. In answer to Paragraph 22 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

23. In answer to Paragraph 23 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because

Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

**Corporate Waste And Packaging Stock Shrinkage**

24. In answer to Paragraph 24 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

25. In answer to Paragraph 25 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

26. In answer to Paragraph 26 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

27. In answer to Paragraph 27 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

28. In answer to Paragraph 28 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

29. In answer to Paragraph 29 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

/ / /

30. In answer to Paragraph 30 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

**FIRST CAUSE OF ACTION**

**(BREACH OF ORAL CONTRACT AGAINST ALL DEFENDANTS)**

31. In answer to Paragraph 31 of the SAC, Q Trade incorporates by reference paragraphs 1 through 30 of this Answer as if fully set forth herein.

32. In answer to Paragraph 32 of the SAC, Q Trade denies the allegations.

33. In answer to Paragraph 33 of the SAC, Q Trade denies the allegations.

34. In answer to Paragraph 34 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

35. In answer to Paragraph 35 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

36. In answer to Paragraph 36 of the SAC, Q Trade denies the allegations.

37. In answer to Paragraph 37 of the SAC, Q Trade denies the allegations.

38. In answer to Paragraph 38 of the SAC, Q Trade denies the allegations.

39. In answer to Paragraph 39 of the SAC, Q Trade denies the allegations.

40. In answer to Paragraph 40 of the SAC, Q Trade denies the allegations.

**SECOND CAUSE OF ACTION**

**(FRAUD AGAINST ALL DEFENDANTS)**

41. In answer to Paragraph 41 of the SAC, Q Trade incorporates by reference paragraphs 1 through 40 of this Answer as if fully set forth herein.

/ / /

42. In answer to Paragraph 42 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

43. In answer to Paragraph 43 of the SAC, Q Trade denies the allegations.

44. In answer to Paragraph 44 of the SAC, Q Trade denies the allegations.

45. In answer to Paragraph 45 of the SAC, Q Trade denies the allegations.

46. In answer to Paragraph 46 of the SAC, Q Trade admits that Natasha Nakielski and Dil Seneviratne exchanged emails on September 8, 2025. Except as to those allegations expressly admitted, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

47. In answer to Paragraph 47 of the SAC, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied.

48. In answer to Paragraph 48 of the SAC, Q Trade denies the allegations.

49. In answer to Paragraph 49 of the SAC, Q Trade denies the allegations.

50. In answer to Paragraph 50 of the SAC, Q Trade denies the allegations.

51. In answer to Paragraph 51 of the SAC, Q Trade denies the allegations.

52. In answer to Paragraph 52 of the SAC, Q Trade denies the allegations.

## THIRD CAUSE OF ACTION

## (NEGLIGENCE AGAINST ALL DEFENDANTS)

53. In answer to Paragraph 53 of the SAC, Q Trade incorporates by reference paragraphs 1 through 52 of this Answer as if fully set forth herein.

54. In answer to Paragraph 54 of the SAC, Q Trade denies the allegations.

55. In answer to Paragraph 55 of the SAC, Q Trade denies the allegations.

/ / /

/ / /

**<u>FOURTH CAUSE OF ACTION</u>**

**(BREACH OF EXPRESS WARRANTY AGAINST ALL DEFENDANTS)**

56. In answer to Paragraph 56 of the SAC, Q Trade incorporates by reference paragraphs 1 through 55 of this Answer as if fully set forth herein.

57. In answer to Paragraph 57 of the SAC, Q Trade denies the allegations.

58. In answer to Paragraph 58 of the SAC, Q Trade denies the allegations.

59. In answer to Paragraph 59 of the SAC, Q Trade denies the allegations.

60. In answer to Paragraph 60 of the SAC, Q Trade denies the allegations.

61. In answer to Paragraph 61 of the SAC, Q Trade admits that Natasha Nakielski sent Dil Seneviratne an email on September 9, 2025. Except as to those allegations expressly admitted, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

62. In answer to Paragraph 62 of the SAC, Q Trade admits that counsel for Lamill, Inc. sent Q Trade a demand letter dated June 5, 2026. Except as to those allegations expressly admitted, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

63. In answer to Paragraph 63 of the SAC, Q Trade denies the allegations.

**<u>FIFTH CAUSE OF ACTION</u>**

**(BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AGAINST ALL DEFENDANTS)**

64. In answer to Paragraph 64 of the SAC, Q Trade incorporates by reference paragraphs 1 through 63 of this Answer as if fully set forth herein.

65. In answer to Paragraph 65 of the SAC, the allegations are non-factual, argument, or state a legal conclusion to which no response is required. To the extent the remaining allegations in this paragraph require a response, Q Trade denies the allegations because they are too vague to be expressly admitted or denied.

66. In answer to Paragraph 66 of the SAC, Q Trade denies the allegations.

67. In answer to Paragraph 67 of the SAC, Q Trade denies the allegations.

68. In answer to Paragraph 68 of the SAC, Q Trade denies the allegations.

69. In answer to Paragraph 69 of the SAC, Q Trade admits that Natasha Nakielski sent Dil Seneviratne an email on September 9, 2025. Except as to those allegations expressly admitted, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

70. In answer to Paragraph 70 of the SAC, Q Trade admits that counsel for Lamill, Inc. sent Q Trade a demand letter dated June 5, 2026. Except as to those allegations expressly admitted, Q Trade denies the allegations, in part because they are too vague to be expressly admitted or denied, and in part because Q Trade does not have sufficient knowledge or information to form a belief as to the truth of the allegations.

71. In answer to Paragraph 71 of the SAC, Q Trade denies the allegations.

## SIXTH CAUSE OF ACTION

## (VIOLATION OF UNLAWFUL COMPETITION ET. AL LAW [*SIC*] (BUS. & PROF. §17200))

72. In answer to Paragraph 72 of the SAC, Q Trade incorporates by reference paragraphs 1 through 71 of this Answer as if fully set forth herein.

73. In answer to Paragraph 73 of the SAC, the allegations are non-factual, argument, or state a legal conclusion to which no response is required. To the extent the remaining allegations in this paragraph require a response, Q Trade denies the allegations.

74. In answer to Paragraph 74 of the SAC, Q Trade denies the allegations.

75. In answer to Paragraph 75 of the SAC, Q Trade denies the allegations.

76. In answer to Paragraph 76 of the SAC, Q Trade denies the allegations.

77. In answer to Paragraph 77 of the SAC, Q Trade denies the allegations.

78. In answer to Paragraph 78 of the SAC, Q Trade denies the allegations.

79. In answer to Paragraph 79 of the SAC, Q Trade denies the allegations.

80. In answer to Paragraph 80 of the SAC, Q Trade denies the allegations.

**PRAYER FOR RELIEF**

In answer to the SAC's prayer for relief and each portion thereof, the allegations set forth therein are argument or conclusions of law to which no response is required. To the extent the allegations in the SAC's prayer for relief are factual in nature or an answer to the allegations in the prayer is otherwise required, Q Trade denies the allegations in the prayer for relief.

**DEFENSES AND AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

**(Lack of Article III Standing)**

1. Defendant alleges that Plaintiff lacks Article III standing to assert some or all of the claims in the SAC.

**SECOND AFFIRMATIVE DEFENSE**

**(Lack of Capacity)**

2. Defendant alleges that Plaintiff lacks capacity standing to assert some or all of the claims in the SAC.

**THIRD AFFIRMATIVE DEFENSE**

**(Not Real Party In Interest)**

3. Defendant alleges that Plaintiff is not the real party in interest and, therefore, lacks standing to bring some or all of the claims in the SAC.

**FOURTH AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

4. Defendant alleges that Plaintiff's claims in the SAC are time-barred to the extent the alleged conduct took place outside the applicable statute of limitations period.

/ / /

/ / /

/ / /

**FIFTH AFFIRMATIVE DEFENSE**

**(Laches)**

5. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

**(Lack of Reasonable Notice)**

6. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, due to Plaintiff's failure to provide Defendant reasonable notice of any alleged breach, including but not limited to breach of any express or implied warranty.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Economic Loss Rule)**

7. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, by the economic loss rule.

**EIGHTH AFFIRMATIVE DEFENSE**

**(Novation)**

8. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, because the purchase orders issued by Lamill, Inc., and Defendant's provision of goods pursuant to those purchase orders, created a new contract that substituted in place of any alleged offer or agreement made prior to the issuance of the purchase orders.

**NINTH AFFIRMATIVE DEFENSE**

**(Fraud)**

9. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, because the purchase orders issued by Lamill, Inc. fraudulently induced Q Trade to furnish products that complied with the terms of the purchase orders rather than some other prior oral terms or statements allegedly made by Q Trade (which Defendant denies making).

/ / /

/ / /

**TENTH AFFIRMATIVE DEFENSE**

**(Adequate Remedy at Law)**

10. Defendant alleges that Plaintiff's claims in the SAC for injunctive relief and equitable relief are barred because there is an adequate remedy at law.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Failure to Mitigate)**

11. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, by failure to mitigate.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Assumption of Risk)**

12. Defendant alleges that at or about the time, date, and place mentioned in the SAC, if any risk was attendant upon the activities of the Plaintiff, which Defendant denies, then Plaintiff knew full well of such risk, and voluntarily and without compulsion or coercion encountered such risks.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Comparative Negligence)**

13. Defendant alleges that if they are found liable to Plaintiff, which they deny, then other defendants in this action are also liable and, as a result, the damages sustained by Plaintiff, if any, must be apportioned between the defendants based on the principles of comparative negligence.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Comparative Reduction Because of Other Parties Actions)**

14. Defendant alleges the alleged accident and damages complained of by Plaintiff, if there actually were any, were proximately caused by the negligence of Plaintiff and/or firms, persons, corporations, or entities other than the Defendant, and that this negligence comparatively reduces the percentage of any negligence attributable to Defendant, if it should be found there was negligence, which Defendant expressly denies.

**FIFTEENTH AFFIRMATIVE DEFENSE**

**(Consent)**

15. Defendant alleges Plaintiff and/or its agents, servants, and/or employees at all times gave their consent, express or implied, to the acts, omissions, representations, states of mind, and courses of conduct of Defendant as alleged in the SAC and in the purported causes of action therein.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**(Waiver)**

16. Defendant alleges that Plaintiff or its agents, servants, and/or employees expressly and impliedly waived all claims arising from the allegations of the SAC and from the purported causes of action contained SAC.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**(Estoppel)**

17. Defendant alleges that Plaintiff is estopped from asserting the allegations contained in the SAC and the purported causes of action contained therein by reason of its acts, omissions, representations, states of mind, and courses of conduct, upon which Defendant relied to their prejudice and detriment.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**(Excuse)**

18. Defendant alleges Plaintiff and/or its agents, servants, and/or employees, by virtue of their acts, omissions, breaches, and/or torts, including breaches of fiduciary duty, expressly or impliedly by operation of law, excused Defendant from any and all obligations alleged in the complaint and the purported causes of action contained therein.

**NINETEENTH AFFIRMATIVE DEFENSE**

**(Full Disclosure)**

19. Defendant alleges that, at all times herein, Plaintiff was fully aware of the facts relating to the subject of this litigation, including the nature and certifications related to the products sold to Lamill, Inc.

**TWENTIETH AFFIRMATIVE DEFENSE**

**(No Damages by Acts of these Defendants)**

20. Defendant alleges Plaintiff, in connection with any of the transactions or allegations in the SAC, has not suffered damages by reason of the alleged acts or omissions of Defendant, and Plaintiff has no valid claim against Defendant.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

**(Offset)**

21. Defendant alleges they are entitled to an offset or set-off by reason of the acts, omissions, representations, and courses of conduct by Plaintiff and/or its agents, servants, and/or employees.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

**(Proximate Cause)**

22. Defendant alleges if Plaintiff suffered or sustained any loss, damage, or injury as alleged in the SAC, which Defendant expressly denies, such loss, damage, or injury, if any, was proximately caused by and in consequence of Plaintiff's own conduct.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

**(Ratification)**

23. Defendant alleges that Plaintiff is barred from asserting the purported causes of action contained in the SAC, and from otherwise asserting any right to relief against Defendant, because Plaintiff and/or its agents, servants, and/or employees at all times ratified the acts, omissions, representations, and courses of conduct of Defendant.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

**(Speculative Damages)**

24. Defendant alleges that Plaintiff is barred from any recovery against Defendant because its alleged damages are speculative.

/ / /

/ / /

/ / /

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

**(Superseding Negligence)**

25. Defendant alleges if the Plaintiff sustains any damage or incurs any liability as a result of the action filed by Plaintiff in this matter, it will be due solely to Plaintiff's independent and superseding negligence or other tortious misconduct that proximately caused the damages, if any, of which Plaintiff now complains.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

26. Defendant alleges that Plaintiff is barred from asserting the purported causes of action contained in the SAC and from otherwise asserting any rights against Defendant by reason of the acts, omissions, representations, and/or courses of conduct of Plaintiff and/or its agents, servants, and/or employees, which amounts to unclean hands.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

**(Voluntary Payment)**

27. Plaintiff's claims are barred, in whole or in part, by the doctrine of voluntary payment.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

**(Privity)**

28. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, because Plaintiff lacks privity with Defendant.

**TWENTY-NINTH AFFIRMATIVE DEFENSE**

**(Compliance)**

29. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, because any product sold by Defendant (including any packaging or labeling of its products) is, and always has been, in compliance with all applicable statutes and regulations at the time such product was manufactured, packaged, labeled, and sold. These statutes include, but are not limited to, statutes administered and regulations

promulgated by the USDA, FDA, FTC, and other federal and state agencies, departments, divisions, and commissions.

**THIRTIETH AFFIRMATIVE DEFENSE**

**(No Materiality or Justifiable Reliance)**

30. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, because any allegedly false statements or omissions allegedly attributable to Defendant (which alleged statements or omissions are denied) were not material and were not detrimentally or justifiably relied upon by Plaintiff.

**THIRTY-FIRST AFFIRMATIVE DEFENSE**

**(Damages Too Speculative and Remote)**

31. Defendant alleges that Plaintiff's claims in the SAC are barred, in whole or in part, because the damages are too speculative and remote.

**THIRTY-SECOND AFFIRMATIVE DEFENSE**

**(Reservation)**

32. Defendant presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses. Defendant reserves the right to assert additional defenses in the event discovery indicates that they would be appropriate.

WHEREFORE, having fully answered the complaint, Defendant hereby requests that the court enter an order as follows:

1. That Plaintiff takes nothing by its SAC;

2. That judgment be granted in favor of Defendant and against Plaintiff, as to all causes of action in the SAC;

3. That the SAC, including each and every purported cause of action, be dismissed, in its entirety, with prejudice;

4. That Defendant be awarded all costs of suit and reasonable attorneys' fees incurred herein; and

/ / /

5. For such other, further and different relief as the court deems just, equitable, and proper under the circumstances.

Respectfully submitted,

KLEIN & WILSON LLP

Dated: September 30, 2026

By: /s/ *William P. Keith*
William P. Keith
Attorneys for Q Trade International Corp.

**DEMAND FOR JURY TRIAL**

Defendant hereby demands a jury trial on all claims triable by a jury, pursuant to Federal Rules of Civil Procedure, Rule 38.

Respectfully submitted,

KLEIN & WILSON LLP

Dated: September 30, 2026

By: /s/ *William P. Keith*
William P. Keith
Attorneys for Q Trade International Corp.

## COUNTERCLAIM

Counterclaimant Q Trade International Corp. alleges the following against Lamill, Inc., a California corporation.

## INTRODUCTION

1. There are two sides to this dispute. On one is Q Trade, a company with decades of experience in the importation, blending, and sale of tea under both its own labels and to well-known national brands. On the other is Craig Min and his companies, Lamill, Inc. and Sun Garden, which historically have operated in the tea and coffee industry.

2. In 2023, as part of a deal orchestrated by Min, Sun Garden sold substantially all of its assets to Q Trade. The transferred assets included Sun Garden's inventory of tea, tea formulations, and customer labels, and associated processes including an extensive collection of tea that Min and Sun Garden represented was organic tea.

3. Before the sale transaction, Sun Garden supplied organic and non-organic tea to Lamill, its sister company. After the sale, Lamill began ordering the same tea from Q Trade, who had assumed possession of Sun Garden's inventory. Lamill issued Q Trade purchase orders that called for either "organic" or non-organic tea ("Purchase Orders"). Accordingly, Q Trade supplied Lamill with organic or non-organic tea, as called for in the Purchase Orders. In other words, Q Trade gave Lamill exactly what it ordered.

4. No Lamill purchase order requested tea that could be labeled and sold with the USDA Organic seal, something which would require all parties in the supply chain to meet additional requirements than those necessary to simply sell organic tea. Upon information and belief, Lamill did not even possess an organic certificate that would allow Lamill to sell tea to consumers or others using the USDA Organic seal and, therefore, Lamill was not legally permitted to make that claim on its packaging regardless of what it purchased from Q Trade.

5. Now, in an apparent attempt to renegotiate the sale transaction and extract more money from Q Trade, Min has attempted to use Lamill to sue Q Trade based on the theory that the organic tea Q Trade sold Lamill—i.e., the exact tea Q Trade obtained from Min's other company—is not sufficiently "organic."

6. Rather than being the victim, Min and his companies actually cut a favorable deal with Q Trade —a deal too favorable, in fact. Since the sale, Q Trade has learned of significant undisclosed costs, receivables, and unsecure client and key vendor relationships that Min, Sun Garden, and Lamill concealed from Q Trade during the sale transaction. Moreover, Q Trade has learned that Sun Garden did not even possess a valid organic certificate at the time of the sale transaction. In sum, Q Trade received only a fraction of what it paid for.

**PARTIES AND VENUE**

7. Q Trade International Corp. is a Texas corporation with its principal place of business in Brookshire, Texas.

8. Sun Garden Specialty Tea Inc. is a California corporation with its principal place of business in Alhambra, California.

9. Craig Min is an individual who, on information and belief, resides and works in Alhambra, California.

10. Lamill, Inc. is a California corporation with its principal place of business in Alhambra, California.

11. Roes 1 through 50, inclusive, are third-party defendants whose identities have not yet been ascertained. They are individuals, partnerships, corporations, or some other business entity. On information and belief, each Roe defendant was somehow responsible for the damages caused in this case. As soon as the true identities and capacities of the Roe defendants have been ascertained, Q Trade's Third-Party Complaint will be amended to reflect the true names and capacities of each Roe defendant.

/ / /

12. Lamill and each Third-Party Defendant was the agent, alter-ego, employee, principal, partner, joint venturer, employer, or in some other capacity derivatively responsible for each of the acts of Lamill and the other Third-Party Defendants.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and because the action is between citizens of different states.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(1) because Lamill resides in this district.

15. Alternatively, venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to Q Trade's claims occurred in this judicial district. In addition, venue is proper in this district pursuant to 28 U.S.C. §1391(b)(3) because Lamill is subject to the Court's personal jurisdiction with respect to this action.

**ALTER EGO ALLEGATIONS**

16. Q Trade is informed and believes and based thereon alleges that there exists, and at all times relevant to this action existed, such a unity of interest and ownership between Lamill and Third-Party Defendants Sun Garden and Min that any individuality and separateness between them has ceased so that Lamill, Sun Garden, and Min are the alter egos of each other. Adherence to the fiction of a separate existence that Lamill, Sun Garden, and Min are separate entities or persons would sanction fraud and promote injustice.

17. Q Trade is informed and believes and based thereon alleges that at all times relevant to this action Min owned all or substantially all of Sun Garden and Lamill, that Min held all officer and director positions of Sun Garden and Lamill, that Min ran both entities out of the same office, and that Min directed the operations of both entities.

18. Q Trade is further informed and believes that Sun Garden, Lamill, and Min have disregarded legal formalities and have failed to maintain an arm's-length

relationship, among other things, leading to the lack of any meaningful distinction between them.

19. At all times relevant to this action, Sun Garden and Lamill used the same offices and facilities, and many of the same employees. Employees of Lamill regularly performed work for Sun Garden and vice-versa, and were regularly paid by a sister company rather than the company for whom they performed services.

20. Q Trade is informed and believes that Sun Garden and Lamill purchased products and services for each other and Min in order to conceal their true operations from the IRS and manipulate and lower their respective tax liabilities.

21. Q Trade is informed and believes that Sun Garden, acting under the direction of Min, transferred funds from Sun Garden to Lamill and Min to avoid foreseeable liabilities created by Sun Garden's actions and omissions in connection with the asset sale discussed below. Q Trade is informed and believes that these actions left Sun Garden as an undercapitalized shell company incapable of satisfying its current obligations.

## BACKGROUND

### A. Q Trade Negotiates with Sun Garden and Min, and the Parties Enter Into the Asset Purchase Agreement

22. For over 30 years, Q Trade has specialized in the importation, blending, and sale of tea. In addition to selling products under its own private labels, a large part of Q Trade's business involves selling loose or packaged tea to wholesalers, retailers, and beverage manufacturers.

23. One of Q Trade's core strengths lies in creating and selling organic tea and organic tea blends. Q Trade has extensive and long-term relationships with organic certified tea gardens, and is highly experienced in providing its customers with organic tea products that meet their specific needs.

/ / /

/ / /

24. In 2017 and 2019, Sun Garden and Min approached Q Trade concerning the potential sale of Sun Garden or its assets to Q Trade. However, despite initial negotiations, Sun Garden and Min ultimately backed away from the discussions.

25. In 2023, Sun Garden again approached Q Trade about the sale of Sun Garden or its assets. This time, the negotiations progressed and the parties reached a deal. Min, Sun Garden's owner, personally conducted most of the negotiations on behalf of Sun Garden. Q Trade's CEO, Manjiv Jayakumar ("Jayakumar"), generally acted as Q Trade's representative.

26. Following their negotiations, Q Trade, Sun Garden, and Min executed an Asset Purchase Agreement ("APA") dated November 8, 2023, and a variety of other documents to carry out the sale transaction (collectively, the "Sale Documents"). As provided for in Section 1.1 of the APA, Sun Garden and Min agreed to sell and transfer all of Sun Garden's assets and inventory to Q Trade. This included all the inventory of tea products that Sun Garden was supplying to its customers, including Lamill.

27. The APA contains a series of representations and warranties, which reference an accompanying set of Disclosure Schedules (the "Disclosure Schedules").

28. In Section 2.2 of the APA, Sun Garden and Min represented that all of the financial and sales information in Schedule 2.2(a) and 2.2(b) of the Disclosure Schedules was complete and accurate.

29. Schedules 2.2(a) and 2.2(b) contain extensive information on Sun Garden's products and customers. For example, Schedule 2.2(a) contained a detailed "Master Matrix" and Product Catalogue, which listed out each of the tea products Sun Garden was selling to Lamill.

30. Schedule 2.2(b) contains the sales information for Sun Garden's customers. The sales data in that schedule reflects that "La Mill (U.S.) Coffee Specialists, Inc." is one of Sun Garden's top five customers by sales. Since there is no entity by the name "La Mill (U.S.) Coffee Specialists, Inc.," Q Trade understood the actual customer to be Lamill.

31. In Section 2.3 of the APA, Sun Garden and Min represented that they were providing Q Trade with their "Formulations," which they represented were complete, accurate, and fairly present[ed]" during the relevant time periods. Schedule 2.3(b) states that it provided Q Trade the "Rights to all formulations set forth in 2024 Master Matrix WIP" attached to the Disclosure Schedules.

32. In Section 2.4 of the APA, Sun Garden and Min represented that they had provided the "Books and Records for the Assets and the Inventory" to Q Trade, and that those materials were "complete and accurate and have been maintained in accordance with sound business practices." As required by this section, Sun Garden and Min provided Q Trade with Sun Garden's Product Catalogue and other books and records related to Sun Garden's inventory. The Product Catalogue and Sun Garden's inventory-related books and records explained various attributes of Sun Garden's inventory, including what products in Sun Garden's inventory were organic.

33. In Section 2.12 of the APA, Sun Garden and Min represented that they maintained specific certifications listed in Schedule 2.12. Section 2.12 of the APA provides in part as follows:

> Section 2.12 Certifications. Each certification listed on Schedule 2.12 of the Disclosure Schedules (the "Certifications") are used by Seller for the Purchased Assets and have been timely obtained by Seller, is in full force and effect and has been complied with in all respects, except as set forth in Schedule 2.12. . . .

34. Schedule 2.12 sets forth a list of the Sun Garden's certifications. Sun Garden's certificate that related to the organic products was described as the Organics QAI, Certificate Certification Number: C0031368-NOPHDLR-3 (the "'68 Organic Certificate").

35. Under Section 2.13 if the APA, Sun Garden and Min represented they were in compliance with all laws. They represented as follows:

> Section 2.13 Compliance with Laws. To Seller's Knowledge, Seller is not subject to or Threatened with a Material Adverse Effect as a result of a failure to comply with a Law applicable to the Assets or the Business, and no event has occurred, or

> circumstance formerly existed or currently exists that (with or without notice or lapse of time) could reasonably be expected to give rise to such a Material Adverse Effect with respect to the Business. To Seller's Knowledge, Seller, the Business and each Purchased Asset is now, and during all applicable statute of limitation periods has been, in compliance with applicable Laws[.]

36. Section 5.1 of the APA contains an indemnity provision that states in relevant part as follows:

> Section 5.1 Indemnification and Reimbursement by Seller and Owner. Seller and Owner will, jointly and severally, indemnify, defend, and hold harmless Purchaser, its Affiliates and their respective Representatives ("Purchaser Indemnified Parties"), and will reimburse Purchaser Indemnified Parties, for all Adverse Consequences arising from or relating to (i) a breach of or inaccuracy in any representation or warranty of Seller or Owner contained in this Agreement or another Transaction Document, (ii) a breach of or failure to perform any of the covenants or agreements of Seller or Owner contained in this Agreement or the Restrictive Covenant Agreement and (iii) the conduct of the Business prior to the Closing Date.

37. The sale transaction between Q Trade, Sun Garden, and Min closed on or about December 10, 2023.

38. After the closing, the parties transferred the Sun Garden inventory and other assets to Q Trade's facility. Q Trade began selling tea directly to many of Sun Garden's former customers, including Sun Garden's sister company, Lamill.

**B. Q Trade's Sale of Tea to Lamill After the Closing**

39. Organic product labeling is governed by the Organic Foods Production Act of 1990 and regulated by the United States Department of Agriculture ("USDA") National Organic Program ("NOP"). The USDA has issued extensive regulations governing organic labeling in general and with respect to specific organic products.

40. The USDA regulates whether and when producers and handlers of organic products may use different types of organic labels. There are different requirements in terms of product composition and certification for labeling products as "100% Organic," "Organic," "Made with Organic" ingredients, and listing organic ingredients on the product's information panel.

41. Under the NOP, only products that qualify for the labels "100% Organic" and "Organic" may contain the USDA Organic seal. In order to sell products with these labels, the USDA requires each party in the chain of custody to obtain and maintain a specific type of organic certificate covering the product. In the case of tea, this would require the tea garden, importer, and any other party that subsequently packages and sells the tea to maintain the appropriate certificate.

42. However, firms sourcing, blending, and supplying tea to others may sell tea as "organic" without going through all of the requirements to use the USDA Organic seal on its packaging. For various reasons, buyers commonly purchase organic products at a premium even if they do not intend to market the product as organic or use a USDA Organic seal. Some buyers want a cleaner product, want to support organic agriculture, or are unable to obtain lower priced non-organic ingredients in the necessary quantities to fill existing demand.

43. After the sale transaction closed in December 2023, Lamill began ordering tea from Q Trade by issuing the Purchase Orders. Depending on the product, the Purchase Orders called for either "organic" tea or did not specify the organic qualities of the tea. In response, Q Trade supplied Lamill with organic or non-organic tea, as called for in the Purchase Orders.

44. The Purchase Orders did not require Q Trade to obtain product-specific certifier approval for Lamill's finished retail products, add Lamill's finished products to Q Trade's Organic System Plan, obtain approval of Lamill's labels or artwork, certify Lamill's downstream repacking facility, or authorize Lamill's finished products to bear the USDA Organic seal.

45. As Lamill knew or should have known, in order to sell finished product using the USDA Organic seal, Lamill was required to maintain its own organic certificate. Upon information and belief, Lamill did not possess an organic certificate that would allow it to sell tea with the USDA Organic seal and, therefore, Lamill was

/ / /

not legally permitted to make that claim on its packaging regardless of what it purchased from Q Trade.[1/]

46. Q Trade did not design or create labels for products sold to Lamill. Rather, Sun Garden or Lamill, both of which are owned by Min, provided all the labels and packaging, which Lamill now claims is inaccurate. At no time did Q Trade agree to certify Lamill's finished products, artwork, facility, or downstream packing operations.

47. Since the closing, when Q Trade started supplying Lamill from Sun Garden's old inventory, Lamill has been chronically late in paying its bills. Typically, Lamill would only pay its outstanding invoices when it needed to purchase additional product.

48. On June 22, 2026, an entity called Lamill Coffee, Inc. filed a complaint against Q Trade in Los Angeles Superior Court, initiating the present action. Q Trade removed the action. On September 23, 2026, Lamill filed a Second Amended Complaint ("SAC") correcting its name from Lamill Coffee, Inc. to Lamill, Inc. While the SAC asserts a variety of claims, Lamill's primary theory is that Q Trade promised to provide Lamill with tea that was sufficiently certified so it could be sold by Lamill using the USDA Organic seal. The SAC ignores that none of the Purchase Orders received by Q Trade call for such a product.

49. The SAC is inaccurate and provides a narrow and misleading version of events.

50. Q Trade has performed all of the obligations required of it, except for obligations not yet due, excused, or prevented by the actions and breaches of Third-Party Defendants.

/ / /

/ / /

[1/] According to the USDA's Organic Integrity Database, there is no organic certificate associated with Lamill whatsoever. See https://organic.ams.usda.gov/integrity/ (last reviewed on September 4, 2026).

**C. Concealment and Misrepresentations by Sun Garden, Min, and Lamill**

51. After the closing of the sale transaction, Q Trade discovered that Sun Garden, Min, and Lamill had misled Q Trade and concealed critical information from Q Trade, including information about the operations of Sun Garden and Lamill.

52. First, during negotiations and before executing the Sale Documents, Min provided Jayakumar and Q Trade with a variety of financial statements and abstracts for tea SKUs that Min and Sun Garden said were representative of Sun Garden products. However, after the sale, Q Trade learned that the costs for other SKUs were far higher than the ones that Min and Sun Garden showed Q Trade. In general, this meant that Sun Garden's product costs were higher than Sun Garden and Min led Q Trade to believe.

53. Second, during negotiations and before executing the Sale Documents, Min provided Jayakumar and Q Trade with a variety of financial statements reflecting Sun Garden's labor costs. For example, Sun Garden's 2022 and 2023 Profit & Loss statement ("P&Ls"), which Min provided, both included line items for direct labor. However, after the sale, Q Trade learned that the labor costs were far higher than what was reflected in the 2022 and 2023 P&Ls and other materials provided to Q Trade. Q Trade has since learned that Sun Garden and Min regularly used some employees interchangeably between the Sun Garden and Lamill organizations, resulting in a substantial understatement of labor costs on Sun Garden's books and concealing the true cost of operating the business.

54. Third, Min and Sun Garden provided financial statements reflecting its accounts receivable. After the sale, however, Q Trade learned that Sun Garden's receivables were far greater than represented to Q Trade. Among other things, Sun Garden's financial statements misled Q Trade with respect to the strength of the customer relationships and the customers' ability and history in paying their bills.

55. Sun Garden and Min furthered the concealment of important information by misleading Q Trade about the accounts receivable and payment history of Sun Garden's largest customer. In 2023, when Sun Garden and Min reengaged Q Trade

about a purchase transaction, Jayakumar asked Min why Sun Garden and Min had backed away from the transaction in 2019. In response, Min informed Jayakumar that it was because Sun Garden was having collection problems with its largest customer, as the customer owed Sun Garden significant funds for tea that Sun Garden had sold. Min represented to Jayakumar that now, however, the issue was resolved and the customer was current.

56. While Q Trade began selling products to the same customer after the closing, the customer fell behind and quickly developed a large receivable with Q Trade. Q Trade then discovered that the customer still had a large receivable with Sun Garden that Sun Garden and Min had failed to disclose. Min's statements about the customer's current payment status concealed the strength of the customer relationship and the challenges that Q Trade would have in collecting from the customer going forward.

57. Fourth, in the APA, Sun Garden and Min represented to Q Trade that Sun Garden's '68 Organic Certificate was "in full force and effect and has been complied with in all respects." This was bolstered by comments that Min and Sun Garden had made during the negotiations leading up to the sale transaction, during which Min and others at Sun Garden stated and implied that Sun Garden held a valid organic certificate.

58. However, Q Trade has since discovered that Sun Garden's '68 Organic Certificate lapsed and, at the time Sun Garden and Min executed the APA, the certificate was invalid.

59. In light of the above, Q Trade seeks a declaration of rights under its agreements with Lamill, damages related to the Third-Party Defendants' fraud and breach of contract, and indemnification and contribution.

**<u>FIRST COUNTERCLAIM</u>**

**DECLARATORY RELIEF**

**(By Q Trade Against Lamill)**

60. Q Trade incorporates by reference paragraphs 1 through 59 of this counterclaim as though fully set forth here.

61. An actual and justiciable controversy within the meaning of 28 U.S.C. §§ 2201 and 2202 exists between the parties in this action concerning their respective obligations and potential liability under the Purchase Orders, Invoices, Sale Documents, and other contracts, documents, and/or communications between the parties.

62. Q Trade desires a determination of the respective rights, duties and liabilities of Q Trade and Lamill with respect to Q Trade's obligation, if any, to provide organic products and products qualified to bear a "USDA Certified Organic" label and/or seal, and otherwise under the parties' contracts. Such a determination is necessary and appropriate at this time to avoid a multiplicity of actions and to effectuate a just and speedy resolution of the issues and liabilities alleged herein.

63. Q Trade seeks a declaration and order from this Court as follows:

A. That Q Trade furnished tea to Lamill that met the terms of the parties' agreement;

B. That Q Trade had no obligation to furnish Lamill products qualified to bear a USDA Organic seal;

C. That Q Trade had no obligation to furnish Lamill products qualified to bear the statements "100% organic," "organic," or made with organic" ingredients on their principal display panel;

D. That Q Trade had no obligation to procure product-specific organic certification from an organic certifying agent, the USDA, or other third party;

E. That Q Trade had no obligation to obtain approval of Lamill's labels or artwork from an organic certifying agent, the USDA, or other third party;

F. That Q Trade had no obligation to obtain approval of Lamill's products or facility from an organic certifying agent, the USDA, or other third party;

G. That Q Trade was only required to furnish products that were composed of organic ingredients if and when called for in Lamill's Purchase Orders; and

H. On any other issues relevant to the dispute between Q Trade and Lamill.

## SECOND COUNTERCLAIM

## FRAUD

## (By Q Trade Against Lamill)

64. Q Trade incorporates by reference paragraphs 1 through 59 of this counterclaim as though fully set forth here.

65. Third-Party Defendants intentionally failed to disclose certain facts to Q Trade, many of which were known only to Third-Party Defendants and which Q Trade could not have discovered. Moreover, Third-Party Defendants' selective disclosures to Q Trade made the disclosures deceptive. By the nature of their concealment and selective disclosures, Third-Party Defendants prevented Q Trade from discovering certain facts.

66. In addition, Third-Party Defendants intentionally made specific representations of fact which were false.

67. Third-Party Defendants intentionally concealed material facts and/or misled Q Trade by performing at least the following acts:

A. By presenting Q Trade with financial statements and abstracts for tea SKUs that were supposedly representative of Sun Garden products, when in fact the statements and abstracts were not representative and did not reflect the actual cost of the majority of Sun Garden's products.

B. By presenting Q Trade with financial statements and documents that inaccurately accounted for the actual cost of labor to run Sun Garden's operations.

C. By concealing the actual amount of Sun Garden's receivables.

D. By concealing the state and history of the receivables and payment history of Sun Garden's largest customer.

E. By representing Sun Garden had a valid organic certificate, when it did not.

68. Q Trade did not know of the concealed facts.

69. Third-Party Defendants intended to deceive Q Trade by concealing the facts.

70. Had the omitted information been disclosed, Q Trade reasonably would have behaved differently.

71. To the extent that Third-Party Defendants' concealment relied upon affirmative representations as well, Third-Party Defendants intended that Q Trade would rely on the misrepresentations, and Q Trade reasonably relied upon them.

72. As a result of Third-Party Defendants' omissions and misrepresentations Q Trade was harmed.

73. Third-Party Defendants' concealment was a substantial factor in causing Q Trade's harm.

74. Third-Party Defendants' conduct was oppressive, fraudulent, and malicious, entitling Q Trade to punitive damages.

75. Lamill, as the alter ego of Sun Garden and Min, is liable to Q Trade for these amounts.

**THIRD COUNTERCLAIM**

**BREACH OF CONTRACT**

**(By Q Trade Against Lamill)**

76. Q Trade incorporates by reference paragraphs 1 through 59 of this counterclaim as though fully set forth here.

77. Q Trade entered into the APA and other Sale Documents with Sun Garden and Min.

78. Q Trade performed each and every obligation on its part to be performed under the Sale Documents, except for those obligations for which Q Trade was excused or prevented from performing.

79. Third-Party Defendants breached the APA and other Sale Documents by taking the following actions, among others:

/ / /

A. By failing to maintain the '68 Organic Certificate in full force and effect and by failing to comply with the certificate in all respects as required by Seller's representation in Section 2.12 of the APA.

B. By engaging in actions described above that failed to comply with law as required by Seller's representation in Section 2.13 of the APA.

C. By failing to deliver the rights to the formulations set forth in the 2024 Master Matrix WIP, as required by Section 2.3 of the APA and 2.3(b) of the Disclosure Schedules.

80. As a result of Third-Party Defendants' breach of the APA and other Sale Documents, Q Trade has been damaged in an amount to be proven at trial.

81. Lamill, as the alter ego of Sun Garden and Min, is liable to Q Trade for these amounts.

**FOURTH CLAIM FOR RELIEF**

**EXPRESS INDEMNITY**

**(By Q Trade Against Lamill)**

82. Q Trade incorporates by reference paragraphs 1 through 59 of this counterclaim as though fully set forth here.

83. Under the APA, Sun Garden and Min agreed to jointly and severally, "indemnify, defend, and hold harmless" Q Trade, and to reimburse Q Trade, "for all Adverse Consequences arising from or relating to (i) a breach of or inaccuracy in any representation or warranty of [Sun Garden and Min] contained in [APA] or another Transaction Document, (ii) a breach of or failure to perform any of the covenants or agreements of [Sun Garden and Min] contained in [the APA] or the Restrictive Covenant Agreement and (iii) the conduct of the Business prior to the Closing Date."

84. In connection with the sale transaction, Sun Garden and Min provided Q Trade with Sun Garden's Product Catalogue and other books and records related to Sun Garden's inventory. In Section 2.4 of the APA, Sun Garden and Min represented that those books and records were complete and accurate. The Product Catalogue and

Sun Garden's inventory-related books and records explained what products in Sun Garden's inventory were organic.

85. When Q Trade resold portions of the inventory acquired from Sun Garden to Lamill, Q Trade relied upon the Sun Garden's Product Catalogue and other books and records related to Sun Garden's inventory, in particular on the classification as organic.

86. The claims in the FAC are based in whole or in part on the allegation that the tea that Q Trade sold to Lamill did not conform to the requirements of the contract between Q Trade and Lamill. At most, that contract required Q Trade to provide tea that was organic.

87. If the tea supplied by Q Trade to Lamill was not organic or failed to meet the requirements of the purchase orders, it was due to Sun Garden and Min's breach and inaccurate statements in the APA and other Sale Documents, including but not limited to those in Section 2.4 of the APA, and Sun Garden and Min's failure to perform under the APA.

88. In addition, upon information and belief, the claims in the FAC are adverse consequences arising from Sun Garden and Min's breaches of the representations in warranties in the APA related to Sun Garden's organic certificate and compliance with laws.

89. As a result of Sun Garden's and Min's breach and inaccuracy of representations in the Sale Documents, breach and/or failure to perform covenants or agreements in the Sale Documents, and failure to indemnify Q Trade, Q Trade has suffered and will continue to suffer damages in the form of attorneys' fees and costs defending against the claims asserted by Lamill's SAC. Moreover, if Q Trade is found liable to Lamill for damages arising from Q Trade's alleged breach of contract and other conduct alleged in the SAC (or any subsequent pleading filed by Lamill), then Third-Party Defendants are also liable to Q Trade for those damages pursuant to the APA's indemnity provisions.

/ / /

90. Lamill, as the alter ego of Sun Garden and Min, is liable to Q Trade for these amounts.

**<u>FIFTH CLAIM FOR RELIEF</u>**

**EQUITABLE INDEMNITY**

**(By Q Trade Against Lamill)**

91. Q Trade incorporates by reference paragraphs 1 through 59 of this counterclaim as though fully set forth here.

92. If Q Trade is found liable based upon the allegations in Lamill's SAC (or any subsequent pleading filed by Lamill), which allegations Q Trade expressly denies, Q Trade's liability, if any, is derivative of that of Third-Party Defendants.

93. Q Trade is informed and believes, and thereon alleges, that Third-Party Defendants' careless, willful, negligent, and/or accidental acts, contributed and proximately resulted in Q Trade's damages, if any.

94. Because the liability, if any, of Q Trade is exclusively derivative of the liability of Third-Party Defendants, Q Trade is entitled to implied or equitable indemnity against Third-Party Defendants for any and all recovery which Lamill or Lamill Coffee may realize against Q Trade, including but not limited to attorneys' fees, pursuant to *Code Civ. Proc.* §1021.6, costs of suit, interest, and any such further relief as the court may deem appropriate.

95. Lamill, as the alter ego of Sun Garden and Min, is liable to Q Trade for these amounts.

**<u>SIXTH CLAIM FOR RELIEF</u>**

**FOR CONTRIBUTION**

**(By Q Trade Against Lamill)**

96. Q Trade incorporates by reference paragraphs 1 through 59 of this counterclaim as though fully set forth here.

97. If Q Trade is held liable to Lamill, or to anyone else, for damages as a result of the incidents and occurrences alleged in the SAC, the damages, if any, were either

wholly or in part directly and proximately caused by the negligence or culpable conduct of Third-Party Defendants, and each of them.

98. Each Third-Party Defendant should be required to pay a share of the damages that is in proportion to the comparative negligence and responsibility of that Third-Party Defendant in causing the damages, and should further be required to reimburse Q Trade for any payment of damages it makes in excess of their proportional share, if any, of all parties' negligence and responsibility for the damages.

99. Lamill, as the alter ego of Sun Garden and Min, is liable to Q Trade for these amounts.

**PRAYER FOR RELIEF**

WHEREFORE, Q Trade International, Corp. prays for the following relief against Lamill, Inc.

**As to the First Claim for Relief:**

1. For a declaration of Q Trade and Lamill's rights under the contracts between Q Trade and Lamill;

2. For a declaration that Q Trade has complied with all terms and conditions of its contracts with Lamill;

3. For a declaration from this Court as follows:

A. That Q Trade furnished tea to Lamill that met the terms of the parties' agreement;

B. That Q Trade had no obligation to furnish Lamill products qualified to bear a USDA Organic seal;

C. That Q Trade had no obligation to furnish Lamill products qualified to bear the statements "100% organic," "organic," or made with organic" ingredients on their principal display panel;

D. That Q Trade had no obligation to procure product-specific organic certification from an organic certifying agent, the USDA, or other third party;

/ / /

E. That Q Trade had no obligation to obtain approval of Lamill's labels or artwork from an organic certifying agent, the USDA, or other third party;

F. That Q Trade had no obligation to obtain approval of Lamill's products or facility from an organic certifying agent, the USDA, or other third party;

G. That Q Trade was only required to furnish products that were composed of organic ingredients if and when called for in Lamill's Purchase Orders; and

H. On any other issues relevant to the dispute between Q Trade and Lamill.

**As to the Second Claim for Relief:**

1. Damages according to proof, in excess of $75,000;
2. Rescission;
3. Punitive and/or exemplary damages;

**As to the Third through Sixth Claims for Relief:**

4. Damages according to proof, in excess of $75,000;

**As to All Claims for Relief:**

5. Prejudgment interest;
6. Attorneys' fees;
7. Costs of suit; and
8. Any and all relief the court may deem just and proper.

Respectfully submitted,

KLEIN & WILSON LLP

Dated: September 30, 2026

By: /s/ *William P. Keith*
William P. Keith
Attorneys for Q Trade International Corp.

**JURY DEMAND**

Q Trade International, Corp. demands a trial by jury of all issues so triable.

Respectfully submitted,

KLEIN & WILSON LLP

Dated: September 30, 2026

By: /*s/ William P. Keith*
William P. Keith
Attorneys for Q Trade International Corp.